My name is Donald Brown. I'm representing certain appellants, Homestore, the company, and 10 individual directors and officers. And appellants would like to reserve five minutes in rebuttal with the Court's permission. I show also a Jennifer Schoda. Are you sharing time? Perhaps we'll share time on rebuttal, not in the opening argument. All right. But you're aware you've got 20 minutes total for your side. All right. Very good. You may proceed. Homestore bought insurance policies designed and intended to protect it and its individual directors and officers against the very real prospect that they might be sued because of misstatements in their financial report. Having such insurance in place is extremely important. Indeed, it's essential to any thinking person's decision to volunteer to serve a company, to serve on a board of directors, or to serve as a senior officer. When, in fact, this company and its individual directors and officers did face such a claim, based on misleading statements in financial reports, the insurers here pulled the rug out from under them, out from all of them. The insurers here contend, and they prevailed in the Court below, that they can rescind coverage for misstatements in financial reports because there were misstatements in financial reports. Now, what is the point? You know, isn't the problem here that the insurance policy required the attachment of the ten Qs, and these were labeled representations? Are we on the same track so far? Yes. That's what that is all true. All right. So any misrepresentation in the representations can be taken into account, can it not? Well, that's the way it's structured. And so what I'm suggesting in my opening remarks here, the insurance, the extent it gives you insurance coverage for that sort of claim, is self-canceling. That is, we, the insurers, can say, we're going to insure you against misrepresentations in your financial statements. Fill out this application. Oh, and by the way, when you send in the application, send us your financial statements. Then, if everything turns out just fine, the insurers keep the premium in their pocket. If it turns out the financial statements contained a misstatement, they say, oh, never mind, deal's off, here's your money back, we don't insure you at all. All right. In your logic, how do you deal with an affirmative false misrepresentation intentionally given? Well, under the policy we have here, and that's the point I was about to get to, the point here the insurers are making is when an individual who signs the application does that, and here we have that. The chief financial officer knew that 10Q was wrong.  They say if one person, that person who signed the application, knows that not something in the application per se is false, but knows that the financial statement that came along with it, stuck in the envelope with it, is false, that everyone loses their insurance coverage. And it's that point. I don't quarrel that he loses his insurance coverage. It's the larger point that the rescission under the insurance policy language goes to, quote, all insurers. And I'm quoting the district court, not the insurance policy, because the policy doesn't say that. It's their point that it goes to all insurers that has us here today. You say the policy doesn't say that? It does not. No. Then what does the policy say? Well, what the policy says is, first of all, if in the application, including a financial statement for purposes of argument here, if in the application there is a misstatement made with intent to deceive, there is no coverage except that directors and officers who did not know of the misstatement still have their coverage. Isn't there a second phrase? Yes. But if you just stop there, there's an intentional misrepresentation in the application with intent to deceive of officers and directors who don't know of the misrepresentation. Their coverage is preserved. Why would we stop there if there's additional language? Because that's the context in which we consider the additional language. Then it goes on to say, and if the misrepresentation was known to individual or individuals who signed the application, this policy is of no effect, this entire policy is void and of no effect whatsoever. And it's that language that we have to look at closely. I don't understand your argument that it doesn't say that if it says that. Well, can I take a step back and I'll tell you what my argument is? And I understand that the insurer's position as to what it may mean is reasonable. I am not here standing saying these folks are nuts, how can they read it that way? I think their reading is a reasonable reading. But our large argument having to do with how you interpret a policy, and to quote someone from an earlier argument, is I'm not mincing words here, but when you look at how a layperson would look at something, it's not, for judges and lawyers, entirely an easy exercise. And here's how you do it. But my confusion is your argument that it doesn't say that. I mean, you have to agree that the policy says what it says. Yes, I do. The wording. You don't argue with the wording of the policy. No. What I argue is that last clause, which we just focused on, is reasonably susceptible to an interpretation whereby it applies in saying that the policy is void in its entirety, that that language applies only to the individuals who signed the application. Now, we're looking at subparagraph C-2. Are we not under representations? Is that the one we're talking about? That's right, in Section 7. All right. And I get where I get because of four basic pillars of California insurance policy. Section 8, actually, not 7, right? You're right. I apologize. Yes. Now, what's the interplay with Section 650 of the statute? There is no interplay. Well, I'm only talking about interpreting the contract right now. There's a separate argument we make about if you do not accept what I say, the contract may be understood to mean a public policy argument. There we talk about 650. But here we have a contract with a severability clause, and the contract governs. Insurance Code 650 says that rescission pursuant to the insurance code is to all insurers. But we're not dealing with rescission pursuant to the insurance code here. We are dealing with rescission pursuant to a written statement, agreement as to when and how there will be rescission. So this isn't a right granted by the section 650 that 650c doesn't apply. And second, 650 explicitly says, unless the contract provides otherwise, and we contend when you look at this with the eyeglasses of McKinnon and Watts and other California Supreme Court cases, Watts is a court of appeal case, it's reasonably susceptible to interpretation whereby this clause does not extend to all insurers. Pillar one on which we rest is, and you heard it in the prior argument, that you have to look at the policy as an ordinary layperson would look at it. And you have to look at it not as a lawyer or a judge or as someone who is not sophisticated insurance manager would look at it. And if there is any reasonable interpretation, even if it's the second most reasonable or even the third most reasonable interpretation, that's the interpretation the Court must adopt under McKinnon and other California laws. Pillar two, when you look at California cases involving multiple insurers, most policies have one insurer, but when you look at the cases we have with multiple insurers, you will see that the California Supreme Court, starting with Aronson in the 50s and Jacober in the 70s, and courts of appeals since have gone to great lengths to say that if you are going to look to the wrongdoing or the misrepresentation of one insurer in order to deprive other coinsurers of their insurance coverage, coinsurers who are innocent of the wrongdoing, you must do so in very clear, precise, unmistakable language. And, in fact, Watts says, in a case where there were two coinsurers and one fraudulent insurer, which I don't think is adequately misrepresented, the fact says that unless the insurance policy, quote, specifically states that the knowledge will be imputed to all other insurers, you don't have that language. The intent is that the coverage is severable, each insurer will be dealt with on his or her own terms, and the wrongdoing of one will not be imputed to the other. You don't think this language imputes the knowledge to the other individuals? I do not. I think What language should have been included? There should have been a specific language saying imputation language in there? Yes. And, in fact, one of the better examples I can think of is in the policy that this insurance company, Genesis, issued within several days of the policy it issued to my client, Home Store, to Cutter and Buck, that's quoted in the Cutter and Buck case in the Western District of Washington for the last year, in which it said just that, that knowledge of individual directors and officers won't be imputed to others except for knowledge of those signing the application. Maybe it learned after this case. I hope it will learn after this case, but I think your point is well taken. But that doesn't necessarily make it null for this particular policy just because the policy evolved, does it? No. I'm saying that, and I think about cases such as McKinnon, where McKinnon looked at the word irritant and said, and it had to think really hard. I mean, it's a dense opinion. It had to think really hard to get to where a layperson might think of what that means, and concluded that an irritant does not include pesticide. I think of Safeco v. Robert S., in which the Supreme Court looked at exclusion for illegal acts and came to the conclusion that illegal acts is so vague and ambiguous they wouldn't enforce it at all, even though they had someone who committed involuntary mass law and was convicted for it. Well, I can see why irritant wouldn't necessarily be a pesticide. McKinnon said it is. McKinnon said it is, but there are other reasons why a reasonable insurer would not think it didn't have coverage for that sort of thing. That's just going too far, given what this insurance was bought for. Counsel, do you want to say anything about the assertion in the brief on the other side that this argument was not raised properly? The point they make there only has to do with conspicuousness, which I haven't addressed yet. You can see that, that it was not raised? We did not raise conspicuousness. And I think the Court has the ability and the right to look at it if it wants to, but I did not raise it. But the arguments I'm making are not about conspicuousness. They're making about, the arguments I'm making are about whether this language is reasonably susceptible to a secondary meaning such that a reasonably insured might, that's the McKinnon word, might conclude that that last clause only goes to the individuals. And a layperson might conclude that, first of all, because the provision itself starts out talking about representations made with an actual intent to deceive. That's one of two choices. Materiality is the other one. So if you're talking in the first instance about an application where the person submitting the application had the intent to deceive, you start out with a case in which the individual signing the application know of the falsehood. So do we assume that this layperson reads the entire provision before deciding what it means? On the interpretation point, I mean, there is, actually you can't in this case because it's a D&O policy. I think you can assume. Cannot? I think you can assume that Homestore read it. I'm just telling you what the real world is. Right. I don't think every director and officer read this policy. In fact, I can guarantee that they did. No, you're talking in terms of a reasonable layperson. My question to you is, should we assume that a reasonable layperson would read the entire provision before deciding what it means? Yes. The third pillar, and I'll go through this quickly, is that you don't interpret a provision that makes the coverage largely illusory. That's McKinnon. That's Safeville v. Robert S. And the fourth pillar is that in looking at the reasonableness of a proffered interpretation, you look at the full implications of the alternative interpretation offered. And if the ramifications lead to absurd results or results contrary to public policy, that lends credence to the other interpretation. And the main point on what we focused on in terms of the actual language is, if the second clause, which preserves coverage for individual directors and officers and preserves coverage for homestore to the extent it is obliged to indemnify them and has coverage under Section 1B, it's explicitly referred to there. When you stop there, and I know we can't stop there, but when you understand what you understand by you get there, those directors and officers and homestore for those directors and officers has coverage in a case of an intentional, actual misrepresentation by the people signing the application. So when you get to the last clause, if it means that the policy is void entirely as to everyone, it takes away what was just given. It makes the prior clause entirely meaningless. And it's a very clear element of interpretation that you do not construe clauses to make a coverage grant nugatory. You strive to give effect to every clause. And the way to give effect to every clause in this provision is to do as Watts did, which said, even though the policy and the policy in Watts said this policy is void in its entirety, even if it says that, it is not void as to everyone unless the language is sufficiently clear to say that this voiding goes to each and every person. The insurers make a lot of, and I would, too, if I were there, of the breadth of that language. The language is very broad, void in its entirety and of no effect whatsoever, to drive home the point that it's a rescission. It's broad in scope because it goes to say we're not just talking about coverage for this claim. We're not just talking about coverage for claims arising out of the misrepresented facts. We're talking about this entire policy has to do. You, individual signer, have lost your insurance altogether, no ifs, ands, or buts about  It is not a clause or is not only subject to construction as a clause that goes to all insurers. Watts says you have to be specific about all insurers. Roberts. You're under 5 minutes. I'll reserve and sit. All right. Let me do so. Good morning. Frederick Baker for Genesis Insurance Company. Also here is Barry Levy on behalf of Federal Insurance Company. And Mr. Levy and I would like to divide our allotted time roughly in half if that's all right with the Court. And I will address the Genesis policy and rescission. And Mr. Levy will address the public policy issues that were raised by the other side. And we will not be hearing from Mr. Sutro or McFadden? No. Mr. Sutro is here and available to argue if specific issues arise with respect to his policy. But if they don't, then Barry will not argue. All right. Let us first be clear as to who are the innocent parties in this matter and who are not. They are not the officers and directors who failed to prevent or to promptly identify and put a stop to the massive accounting fraud and securities fraud that was perpetrated by Homestore here. The innocent parties are the insurers who were defrauded into issuing these policies, who are being asked to pay massive amounts on a risk they never agreed to assume and for which they never received an appropriate premium. Under California law, every insured has a duty to read and is presumed to know the contents of an insurance policy, of its insurance policy. And here's what the policy here says. Again, by acceptance of this policy. What section are you in? I'm sorry, Your Honor. I'm in that same section, 8, general conditions, C, representations. And this is C1. By acceptance of this policy, the directors and officers and the company agree that the statements in the application and any materials submitted therewith are their representations, that they shall be deemed material to the acceptance of the risk or hazard assumed by the insurer under this policy and that this policy is issued in reliance upon the truth of such representations. There is nothing remotely ambiguous about that language in the appellant to not contend otherwise. And what each and every director and officer agreed to there was that Shu's representations were their representations. Shu's misrepresentations were their misrepresentations. Shu's lie was their lie and the lie of Homestore. And that fact alone immediately distinguishes this case from Watts and the other cases relied upon by Planned, because that is clear language imputation. The misrepresentations of Shu under that language are imputed to each and every director and officer. The policy then goes on to state the consequences where the application contains misrepresentations. And let me pause here to identify another fact which distinguishes this case from the cases relied upon by appellants, and that is this. The misrepresentations were the acts to which Mr. Shu pled guilty, falsification of Homestore's financial records as carried forward in the false 10-Q that was filed with the SEC. Those misrepresentations occurred months before Mr. Shu sat down at his desk to fill out this genesis application. The representations, the misrepresentations had been made. The investing public had been deceived. The SEC had been lied to. At the time Mr. Shu signed this genesis application, the facts which gave rise to the investor lawsuits had already taken place. The claims had already accrued. The investor lawsuits had ripened on the basis of facts that were hidden from genesis by Homestore. So this case is not like a case where an insurer issues an automobile policy, and a year later the insurer rears in somebody, and a year after that the insurer gets around to checking the insurer's DMV records. This case is like the guy who sets fire to his barn and drives downtown to buy fire insurance. These wrongs had already occurred at the time the policy was applied for. So what does the policy say are the consequences of these kinds of misrepresentations? There are two. The first, which I will refer to as Clause A, is triggered when the person who signs the policy is unaware that it contains misrepresentations. When that event occurs, the signer, the person who doesn't know, and any other directors and officers who don't know, are entitled to coverage, and those who know that the application contains misrepresentations are not. Thus, if, well, there are three people who are authorized to sign the application, the chairman, the CEO, and the chief financial officer, which is Mr. Hsu. So if the chairman or the CEO had signed the application, I think in this case it was the same person, Mr. Wolf, but if he had signed the application and he had not known that it contained misrepresentations, then he would have been entitled to coverage along with anybody else who didn't know. But there's a separate consequence, and that's Consequence 2, which I will call out Clause B, and it's separated from Clause A by the word and, which means in addition or moreover. And that's the consequence that applies here. It applies when the signer of the application, Mr. Hsu, knows that the application contains material misrepresentations. And here's what that says. I'm going to read that. I'll skip over the Clause A and the intent to deceive because I think that's adequately covered in the briefs. And if you do, then here's what it says. The directors and officers and the company agree that in the event that the application, including materials submitted therewith, contain misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by the insurer under this policy, this policy in its entirety shall be void and of no effect whatsoever if such misrepresentations were known to be untrue on the inception date of the policy by one or more of the individuals who signed the application. That language is clear. It's concise. And it explicates the circumstances, the consequences which result when there is a fraudulent application submitted to the insurer. I think it is easily understood by any layperson who would read this policy. Void in its entirety. No effect whatsoever. No rational person would conclude, as Home Source suggests, that this language begs the question whether it may be void as to some or not as to others, partially effective, partially ineffective. Policy was void in its entirety at the very time of its inception. So what's your response to opposing counsel's observation that Genesis issued an insurance policy that has specific imputation language and, therefore, knew how to do it and didn't do it in this particular policy? Your Honor, as several cases point out, there are various policies out there that are available. Some are specifically severable. Some are not. Some contain other sorts of language. All we can do here, I mean, Home Store chose the policy that it wanted to apply for, and all we can do, I think, is construe the plain language of this policy. Certainly, it could have been written differently, but that does not detract from the fact that this policy was clearly and unequivocally written. And what might appear to be the severe consequences where there is a, where the signer knows that the application contains material representations really isn't. I mean, this, as I pointed out earlier, is a case where Mr. Hsu was seeking coverage for wrongs that had already occurred, and he was seeking that coverage for himself and for others without informing Genesis that there are already right claims against all of these folks. And I think under those circumstances, it is perfectly reasonable to void the policy as all those who sought to benefit from the fraud. So does the application contain misrepresentations? I don't think that's subject to rational dispute. Were they material? Yes. I mean, they were material and they expressed terms of the contract. Each and every officer and director agreed that they were material. They are material as a matter of law. California law holds that where reasonable minds would not disagree as to the materiality of the representations, it can be determined as a matter of law. And we cited a number of cases in our briefs where cases under or courts under facts analytically indistinguishable from this case have, in fact, found that misrepresentations of this sort are material as a matter of law. Did Hsu know that the misrepresentations were false? Clearly, he did. Those facts in and of themselves are sufficient to support the trial court's finding that this contract was rescinded. What are we to make of the argument that Homestore makes that the policy language was ambiguous? I frankly have read the argument several times, and I think Genesis' policy language is much more clear than the argument. But at bottom, it advances from the notion that there is some inherent conflict between Clause A and Clause B, and that conflict must be decided in favor of the insurer, of the insurer's coverage for the insurer. But that is a false reading of the policy. The policy clearly states there are two consequences where the application contains misrepresentations, one where the signer didn't know, one where the signer does know. Hsu knew. The consequence of his filing a materially false application of Genesis under the clear terms of the policy was that the policy was rescinded in its entirety as to every officer and director. Roberts. You're down to 10 minutes. All right, Your Honor, I will turn the podium over to Mr. Beebe. Good morning, Your Honors. Good morning. As an excess carrier in this case, and I think speaking to the other excess carriers, we adopt the arguments that Mr. Baker has just made. Very well. I was, the way we had contemplated here, I was going to address the public policy issues. Counsel, the Homestore Counsel, never did address those. I think you've addressed them very eloquently in the brief, Mr. Leiby. Thank you, Your Honor. I'm prepared to see if the Court has any questions. No further questions. Thank you. Thank you. The case, excuse me, excuse me, excuse me. Mr. Brown has reserved some time for rebuttal. A couple minutes. Thank you. Appreciate that. I agree that the insurance companies are, quote, innocent parties who were misled by Mr. Hsu. I would say in the next breath that the insurance industry, as they point out in their briefs and we point out in our reply, are perfectly willing to issue insurance policies that protect innocent directors when a single crook fools both the insurance company and them, the innocent directors. We're not talking about no one in their right mind would ever issue such a policy. They issue those policies all the time. The question is, is this one or not? And the second question is, even if they meant it not to be, and I think they meant it not to be, is it nonetheless reasonably susceptible to an interpretation under the principles set forth in McKinnon and EMI to a secondary interpretation such that, as Watts said, there is no imputation to the innocent insurance absent more specific imputation language? Counsel, what's your response to opposing counsel's observation that all of the directors and officers accepted or adopted Hsu's representations as their own? I'll accept that for the argument, because I'm saying that the clause of the policy language does say that. It does. No director or officer signed that, and there's no evidence in the record, despite what someone just said, that Homestore chose this language. There's no evidence in the record at all about who chose the language. There was no discovery in the case before Federal filed its motion for summary judgment. The language says that the policy was purchased by Homestore for the benefit of the officers and directors, and it says that. But in any event, if you are correct, nonetheless, our core argument is that that last clause in subpart 2 can reasonably, or in the words of McKinnon, might reasonably be understood by a layperson not to go to her or him if, as in the prior clause, he or she didn't know about the fraud. That's what this policy says. I'm not saying it says it clearly. I'm not saying you don't have to think about it for a moment, as McKinnon did and as EMI did when it concluded that the word upon means outside a car. But the language is susceptible to the meaning we give it, and Jacober and all the cases in its wake say that if it's reasonable, we must do it. Thank you. Thank you, counsel. The case just argued will be submitted for decision, and the Court will take its morning
judges: O'scannlain, Rawlinson. Whaley